UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

JAY SCOTT HARRISON                    CIVIL ACTION NO. 6:20-cv-00810

VERSUS                                JUDGE JUNEAU

COMMISSIONER OF THE SOCIAL            MAGISTRATE JUDGE HANNA
SECURITY ADMINISTRATION

## REPORT AND RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability.

Considering the administrative record, the briefs of the parties, and the applicable

law, and for the reasons set forth below, it is recommended that the Commissioner's

decision should be affirmed.

## Administrative Proceedings

The claimant, Jay Scott Harrison, fully exhausted his administrative remedies

before filing this action.   He applied for disability insurance benefits and

supplemental security income benefits, alleging that he became disabled on April 6,

2015.[1]  His applications were denied.[2]  He requested a hearing, which was held on

March 20, 2019 before Administrative Law Judge Edward L. Thompson.[3]   He

---

[1]     Rec. Doc. 9-1 at 180, 182.

[2]     Rec. Doc. 9-1 at 79, 80.

[3]     A transcript of the hearing is found in the record at Rec. Doc. 9-1 at 35-78.

amended his applications to seek benefits for a closed period from April 6, 2015 to February 11, 2019.[4]  The ALJ's decision, issued in June 2019, concluded that Mr. Harrison was not disabled within the meaning of the Social Security Act during that time period.[5]  Mr. Harrison sought Appeals Council review, but the Appeals Council found no basis for reviewing the ALJ's decision.[6]  Therefore, the ALJ's decision became the Commissioner's final ruling.[7]  Mr. Harrison then initiated this action, seeking judicial review of the Commissioner's decision.

## Summary of Pertinent Facts

Mr. Harrison was born on April 24, 1967[8] and was 52 years old at the time of the ALJ's decision.  He earned a degree in psychology and completed six hours of graduate work toward a master's degree in special education teaching.[9]  Before the onset of his alleged disability, he worked as a public school teacher, an assistant manager for a food distribution company, a lawn care worker, a merchandiser and

---

[4]    Rec. Doc. 9-1 at 18, 253.  Because Mr. Harrison went back to work on February 4, 2019 earning at a substantial gainful activity level, however, the ALJ sometimes used February 4, 2019 as the end date of the alleged closed period of disability.  (See, e.g., Rec. Doc. 9-1 at 21).

[5]    Rec. Doc. 9-1 at 29.

[6]    Rec. Doc. 9-1 at 4.

[7]    *Higginbotham v. Barnhart*, 405 F.3d 332, 336 (5th Cir. 2005).

[8]    Rec. Doc. 9-1 at 180, 182.

[9]    Rec. Doc. 9-1 at 52, 498.

stocker in retail stores, a retail store assistant manager, and a manager trainee in the construction industry.[10]  He is also an ordained minister.[11]  He alleged that he was disabled between April 6, 2015 and February 11, 2019 due to diabetes mellitus with peripheral neuropathy, subarachnoid hemorrhage survivor with massive headaches, hyperlipidemia, benign hypertension, degeneration of thoracic intervertebral discs, degeneration of cervical intervertebral discs, severe cervical foraminal stenosis, pain in the thoracic spine, spasms of his back muscles, and prolapsed lumbar intervertebral discs.[12]

On April 8, 2015, Dr. Rohini Bernhard treated Mr. Harrison for diabetic neuropathy and Mr. Harrison also complained about back pain and muscle spasms. The doctor noted that he was not compliant with diet, exercise, blood sugar logs, or medication.  Examination showed abnormalities in his thoracic and lumbar spine including muscle spasms and decreased sensation in both feet.  The assessments were uncontrolled Type 2 diabetes mellitus, diabetic autonomic neuropathy, and hyperlipoproteinemia type II-B.  Mr. Harrison returned to Dr. Bernhard on April 21, 2015, complaining about numbness in his back.[13]

---

[10]      Rec. Doc. 9-1 at 202, 232.

[11]      Rec. Doc. 9-1 at 70.

[12]      Rec. Doc. 9-1 at 81-82.

[13]      Rec. Doc. 9-1 at 454.

On May 5, 2015, Mr. Harrison wen to the emergency room at University Hospital & Clinics ("UHC") in Lafayette, Louisiana, complaining of back and neck pain.[14]   He reported burning and aching pain radiating into his right arm and requested a referral to the neurology clinic.   An MRI of his cervical spine showed degenerative changes with varying degrees of canal and neural foraminal stenosis, most significant at C5-C6 and C6-C7.   More particularly, the MRI showed a moderate broad-based disc osteophyte complex and bilateral uncovertebral and facet joint arthropathy resulting in moderate to severe bilateral neural foraminal stenosis at C5-C6 as well as severe disc space loss and disc desiccation at C6-C7 with significant bilateral uncovertebral hypertrophy resulting in severe left and moderate-to-severe right neural foraminal stenosis.   Just five days later, on May 10, 2015, Mr. Harrison returned to the UHC emergency room, again complaining of back and neck pain, and he was given Tramadol.[15]

Mr. Harrison returned to the UHC emergency room on June 20, 2015,[16] reporting fatigue and generalized pain rated 8 out of 10.   He said he had been walking in a store and kept bumping into things on the right and felt disoriented.   A CT scan of his brain was unremarkable and showed no hemorrhage or recent ischemic infarct.

---

[14]      Rec. Doc. 9-1 at 315-317.

[15]      Rec. Doc. 9-1 at 300-314.

[16]      Rec. Doc. 9-1 at 267, 272-299.

His strength and range of motion were normal.  He was diagnosed with vertigo and discharged.

Mr. Harrison returned to the UHC emergency room on July 8, 2015, complaining of chronic back pain and requesting a neurology referral.[17]  He reported that his symptoms, including body spasms and numbness to both hands, were worsening.  Muscle spasms in his neck were observed, but he had a full range of motion in his cervical spine and lumbar spine.  He was diagnosed with cervical radiculopathy and foraminal stenosis of the cervical region.

On November 10, 2015, Mr. Harrison went to the emergency room at Lafayette General Medical Center in Lafayette, Louisiana, complaining about a sudden posterior headache.[18]  He described it as the worst headache he had ever experienced and rated his pain at 10 out of 10.[19]  He denied slurred speech, weakness, or gait issues.[20]  A CT angiogram showed an acute subarachnoid hemorrhage.[21]  He was admitted to the intensive care unit in critical condition.[22]  The next day, a

---

[17]     Rec. Doc. 9-1 at 317, 326-345.

[18]     Rec. Doc. 9-1 at 397.

[19]     Rec. Doc. 9-1 at 424.

[20]     Rec. Doc. 9-1 at 415.

[21]     Rec. Doc. 9-1 at 401.

[22]     Rec. Doc. 9-1 at 419.

cerebral angiogram was within normal limits, and he was moved out of the ICU.[23]
He was discharged from the hospital on November 13, 2015 with a diagnosis of
nontraumatic subarachnoid hemorrhage.[24]   However, he returned to the emergency
room that same day,[25] reporting a sudden onset frontal headache different from the
previous headache.  He also reported that the Norco he had been prescribed was not
helping with his pain.  He was readmitted to the hospital, his headache resolved, and
he was released on November 16, 2015.

On January 22, 2016, Mr. Harrison was seen in the internal medicine clinic at
UHC.[26]  His cervical radiculopathy had resolved with physical therapy.  He was to
continue physical therapy, and it was noted that he could work as tolerated.

On March 28, 2016, Mr. Harrison saw nurse practitioner Lauren Bradley at
Duson Family Healthcare in Duson, Louisiana.[27]  She prescribed gabapentin for his
cervical and lumbar radiculopathy and cyclobenzaprine for the spasm of his back
muscles.  She also scheduled an MRI of his thoracic spine.  She planned to refer Mr.
Harrison to a neurosurgeon after reviewing the MRI results.

---

[23]    Rec. Doc. 9-1 at 419.

[24]    Rec. Doc. 9-1 at 436-437.

[25]    Rec. Doc. 9-1 at 371, 385, 391, 563-564.

[26]    Rec. Doc. 9-1 at 318-324.

[27]    Rec. Doc. 9-1 at 476-479.

MRIs of Mr. Harrison's spine were obtained on April 26, 2016.[28]  The MRI of his lumbar spine showed bulging within the mid lumbar spine with generalized facet/ligamentous hypertrophy, moderate right foraminal stenosis at L3-L4, and moderate bilateral foraminal stenosis at L4-L5.  The MRI of his thoracic spine showed generalized degenerative disc disease as well as generalized facet hypertrophy and fairly severe right foraminal stenosis at T4-L5 with additional levels of less prominent foraminal narrowing and straightening of the normal cervical lordosis with building within the mid to lower cervical spine.

Mr. Harrison returned to nurse Bradley on May 24, 2016 in follow up regarding medication refills.[29]  Her assessments were benign hypertension, diabetes mellitus, hyperlipidemia, and back muscle spasms.  His medications were refilled, and he was to keep his appointment with a Tulane neurologist.

Mr. Harrison saw family nurse practitioner Danielle Guidry at the same clinic on October 13, 2016.  Her impressions were diabetes mellitus, hyperlipidemia, benign hypertension, lumbar radiculopathy, Vitamin D deficiency, spasm of back muscles, cervical radiculopathy, prolapsed lumbar intervertebral disc, degeneration of thoracic intervertebral disc, degeneration of cervical intervertebral disc, and

---

[28]    Rec. Doc. 9-1 at 480-481, 503-506.

[29]    Rec. Doc. 9-1 at 473-476.

noncompliance with treatment. His medications were refilled, and he was advised that the clinic did not treat chronic pain.

Mr. Harrison saw nurse Bradley again on October 25, 2016.[30] In addition to diabetes, muscle spasms, and spine problems, Mr. Harrison complained of erectile dysfunction. On November 14, 2016, Mr. Harrison again followed up with nurse Bradley concerning his diabetes and muscle spasms.[31] He saw her again on December 21, 2016.[32] Upon examination, he had poor muscle tone, muscle weakness, bilateral cervical tenderness, and diminished reflexes. The plan was to order another MRI and refill his Cyclobenzaprine.

An MRI of Mr. Harrison's cervical spine, obtained on December 28, 2016,[33] showed acquired central spinal canal stenosis at C5-C6 and C6-C7 related to discopathy and spondylosis with broad-based posterior disc osteophyte complexes without migrating soft disc fragments and no cord or marrow edema; additionally, there was multilevel foraminal stenosis, greatest on the right at C6-C7.

---

[30]     Rec. Doc. 9-1 at 466-469.

[31]     Rec. Doc. 9-1 at 463-466.

[32]     Rec. Doc. 9-1 at 461-463.

[33]     Rec. Doc. 9-1 at 494-495, 509-510.

On January 19, 2017, Mr. Harrison saw nurse practitioner Danielle Guidry at the Duson clinic.[34]  The purpose of the visit was to follow up regarding diabetes, benign hypertension, hyperlipidemia, and spasms of the back muscles.  He was to keep his upcoming appointment with a neurosurgeon, and his medications were refilled.  He was to return in one month.

On February 9, 2017,[35] Mr. Harrison saw Dr. Bharat Guthikonda, a neurosurgeon at Ochsner LSU Health in Shreveport, Louisiana.  He was evaluated for neck pain that he had reportedly experienced since April 6, 2015 when he stepped off a truck trailer and felt a shock to his right upper extremity followed by spasms in his cervical, thoracic, and lumbar spine, and progressively worsening pain.  He reported numbness in his fingertips and toes as well as constant right facial numbness.  He also reported that he had been diagnosed with diabetic neuropathy. He stated that he had received cervical epidural steroid injections approximately twenty years earlier but not recently.  He also reported having physical therapy in 2015 and 2016 with some benefit.   He was taking only Tylenol for pain. Examination of his neck showed a painful range of motion in all directions.  His deep tendon reflexes were not abnormal, sensation was intact to light touch in both arms, strength in both arms was normal, and Hoffman's sign was negative

---

[34]     Rec. Doc. 9-1 at 669-672.

[35]     Rec. Doc. 9-1 at 517-521.

bilaterally. Examination of his lumbar spine showed full range of motion, deep tendon reflexes that were not abnormal, normal strength, a good gait, and negative straight leg raise tests bilaterally. The doctor's assessment was cervical spinal stenosis, neck pain, right arm pain, numbness of fingers of both hands, midline low back pain without sciatica, unspecified chronicity. Anterior cervical discectomy and fusion at C5-6 and C6-7 was recommended.

Mr. Harrison continued to treat with Duson Family Healthcare but most of the treatment notes in the record for subsequent dates are very poor quality and hard to read. On February 16, 2017, Mr. Harrison saw nurse Guidry.[36] Although he was primarily there to refill his medication, he reported that he had felt dizzy that morning, had not eaten much the night before, and had not taken his diabetes medication. He also reported that he did not check his glucose level regularly. It was noted that he walked with a normal, steady gait. The nurse's assessments were spasm of back muscles, dizziness, noncompliance with medication regimen, and uncontrolled Type II diabetes mellitus.

On February 23, 2017, Mr. Harrison was examined by clinical psychologist Sandra B. Durdin at the request of Disability Determination Services.[37] Mr. Harrison explained that he was married and had three children, two of whom were

---

[36]    Rec. Doc. 9-1 at 666-669.

[37]    Rec. Doc. 9-1 at 497-501.

still living at home.  He stated that he had previously served in the National Guard, denied having any legal problems, and claimed that he stopped working in April 2015 when his neck problems began.  He reported that he settled with his last employer.  He reported that he had diabetes, a lumbar disc problem, and a thoracic disc problem, but had not had spine surgery.  He stated that he had never been a psychiatric inpatient.  He complained of pain, and stated that noise bothered him, preventing him from attending church services or other noisy gatherings.  He reported a history of a subarachnoid bleed without a head injury.  He denied substance abuse.  But he claimed to have lost possessions, including his vehicle, and been evicted, resulting in a short stay in a shelter.  He was then taking Metformin, Lisinopril, Vitamin D2, Gabapentin, Fenofibrate, Pravastatin, and Cyclobenzaprine. He claimed that his medication caused erectile dysfunction.

Mr. Harrison explained that he prepared food, had contact with friends and family, used a phone, watched television, read, shopped for food, did chores, and handled money.  He reported that he posted religious messages on Facebook and created educational, family-friendly games.

Dr. Durdin estimated that Mr. Harrison's adaptive functioning and intellectual functioning were in the average range.  She diagnosed him with Somatic Symptom Disorder, Pain; and Adjustment Reaction with Depressed and Anxious Mood.  In her opinion, Mr. Harrison's ability to understand and carry out simple instructions

was not impaired, his ability to sustain attention for two-hour blocks of time was not impaired, his ability to get along with others was not impaired, and his ability to sustain a forty-hour work week was not impaired if he was physically able to work. She did not find that he had any severe cognitive deficits.

On March 16, 2017, Mr. Harrison saw nurse practitioner Guidry for medication refills.[38]   He then saw nurse practitioner Bradley on April 13, 2017.[39] Her assessments were benign hypertension, spasm of back muscles, hyperlipidemia, Type II diabetes, Vitamin D deficiency, and primary insomnia.  On April 18, 2017, Mr. Harrison saw nurse practitioner Bradley again, this time for a wellness examination.[40]   No neurologic or musculoskeletal issues were identified upon examination.  His medications were adjusted, and he was to return in two weeks.  On May 2, 2017, Mr. Harrison returned to nurse practitioner Bradley to follow up with diabetes treatment.[41]   Mr. Harrison saw nurse Bradley again on May 16, 2017.[42] Although the primary purpose of the visit was to obtain medication refills, it was noted that he had been seen at Our Lady of Lourdes Hospital the previous day for

---

[38]     Rec. Doc. 9-1 at 664-666.

[39]     Rec. Doc. 9-1 at 660-664.

[40]     Rec. Doc. 9-1 at 656-660.

[41]     Rec. Doc. 9-1 at 651-654.

[42]     Rec. Doc. 9-1 at 648-651.

left-sided numbness and was diagnosed with cervical radiculopathy and prescribed Cyclobenzaprine.

Mr. Harrison was scheduled for ACDF surgery with Dr. Guthikonda on June 13, 2017. Due to emergency surgeries throughout the day, however, his surgery was rescheduled.[43] The surgery was actually performed on June 30, 2017.[44]

On July 31, 2017, Mr. Harrison saw nurse practitioner Bradley at the Duson clinic for medication refills.[45] It was noted that he had a decreased range of motion in his right shoulder. The assessments were right shoulder pain, spasms of back muscles, Vitamin D deficiency, benign hypertension, hyperlipidemia, primary insomnia, uncontrolled Type II diabetes, and long-term drug therapy. He was encouraged to lose weight and exercise more. He was to return in October for medication refills and lab work.

On August 1, 2017, Mr. Harrison followed up with Dr. Guthikonda.[46] He reported that his preoperative complaints had improved and that he was walking better following surgery. However, he also reported having right shoulder pain since before surgery, which had persisted post-surgery. X-rays showed well-placed

---

[43]    Rec. Doc. 9-1 at 522-527.

[44]    Rec. Doc. 9-1 at 528-541, 555-558.

[45]    Rec. Doc. 9-1 at 643-648.

[46]    Rec. Doc. 9-1 at 542-545.

instrumentation, and it was noted that he moved all extremities well. The surgical scar was well healed. He had full strength in both arms but a reduced range of motion in his right shoulder.

On August 23, 2017, Mr. Harrison again saw nurse practitioner Bradley at Duson Family Healthcare for a wellness examination.[47] His gait was normal, and he had a normal range of motion in all extremities.

On November 2, 2017, Mr. Harris returned to Dr. Guthikonda.[48] He reported muscle spasms in his legs especially at night and pain in his upper arm when reaching. His x-rays looked good, but he was still in pain. The doctor noted that his symptoms would improve with time and prescribed physical therapy.

On November 13, 2017, Mr. Harrison saw nurse practitioner Guidry to get a flu shot, refill his medications, and have his shoulder pain assessed.[49] An MRI of Mr. Harrison's right shoulder obtained on November 16, 2017 showed a labral tear.[50] When he returned to nurse Guidry on November 22, 2017, she reviewed his lab

---

[47]    Rec. Doc. 9-1 at 640-643.

[48]    Rec. Doc. 9-1 at 546-549.

[49]    Rec. Doc. 9-1 at 633-638.

[50]    Rec. Doc. 9-1 at 511-512.

results and refilled his medications.[51]  At that time, Mr. Harrison was awaiting an orthopedic referral for his right shoulder rotator cuff injury.

When Mr. Harrison saw Dr. Guthikonda on February 22, 2018,[52] he reported 100% improvement since surgery.  He had not been able to attend physical therapy and was not taking any pain medication.  He was advised to do more and more activity as tolerated.  He also reported that he had been diagnosed with a right rotator cuff tear and was being treated by an orthopedist.

Mr. Harrison saw nurse practitioner Guidry on March 14, 2018.[53]  He had been released by his orthopedic surgeon and was awaiting MRI results.  He reported improvement in his back, neck, and shoulder.  His medications were refilled.  Her assessments were Vitamin D deficiency, hyperlipidemia, neuropathy, uncontrolled Type II diabetes, injury of the tendon of the rotator cuff of the right shoulder, primary insomnia, and benign essential hypertension.

Mr. Harrison returned to nurse practitioner Guidry on April 19, 2018, primarily complaining of back pain.[54]  His gait was normal.  Mr. Harrison saw her

---

[51]    Rec. Doc. 9-1 at 629-633.

[52]    Rec. Doc. 9-1 at 550-554.

[53]    Rec. Doc. 9-1 at 624-629.

[54]    Rec. Doc. 9-1 at 621-624.

again on April 25, 2018.[55]  He reported spasms in his lower back shooting down into

his legs, wobbling while walking, and increasing back pain.  His ambulation was

noted to be unsteady.  His gait was described as irregular, unsteady, staggering, and

pulling to the left.   Examination showed that his tympanic membrane was

erythematous and opacified.  He was diagnosed with allergic rhinitis and he was to

take allergy medicine to see if his ear problem was contributing to his balance issues.

He was to be referred to a neurologist and for physical therapy.

On X-rays of Mr. Harrison's spine obtained on April 19, 2018 showed mild

dextroscoliosis as well as disc space narrowing and anterior spurring at L2-L3.[56]

On May 30, 2018, Mr. Harrison saw nurse practitioner Jennifer Creswell at

Duson Family Healthcare.[57]  He reported frequently almost falling, having difficulty

walking, and having difficulty knowing where his feet would land when he walked.

His proprioception was altered, and his balance was impaired.  It was observed that

he had a wide-based gait and an inability to walk without bracing against the wall.

On June 8, 2018, Mr. Harrison had an MRI of his head and brain, which showed

questionable dehiscence along the upper aspect of the right superior semicircular

---

[55]      Rec. Doc. 9-1 at 618-621.

[56]      Rec. Doc. 9-1 at 736.

[57]      Rec. Doc. 9-1 at 613-618.

canal and mild inferior mastoid disease.[58]   On June 13, 2018,[59] Mr. Harrison complained to nurse practitioner Leilani Gibbens at Duson Family Healthcare of an abnormal gait.   She noted that an MRI had shown superior semicircular canal dehiscence syndrome in the right ear, for which he was referred to an ENT.

On June 19, 2018, Mr. Harrison complained to nurse practitioner Tiffany Roy at the Duson clinic of muscle spasms, particularly in his left thigh and stomach.[60]

An MRI on July 10, 2018 showed no convincing semicircular canal dehiscence and minimal right inferior posterior mastoid disease.[61]

On July 17, 2018,[62] Mr. Harrison reported to nurse practitioner Guidry at the Duson clinic that he was experiencing high pitched ringing in both ears.   He was referred to an ENT, Dr. Chris Gaffga.

On August 16, 2018, Mr. Harrison saw nurse practitioner Kaylan Schexnyder at Duson Family Healthcare.[63]   He was awaiting a neurological referral from his ENT specialist.   His muscle spasms were controlled with physical therapy, and his

---

[58]     Rec. Doc. 9-1 at 507-508.

[59]     Rec. Doc.  9-1 at 610-613.

[60]     Rec. Doc. 9-1 at 607-610.

[61]     Rec. Doc. 9-1 at 732.

[62]     Rec. Doc. 9-1 at 604-607.

[63]     Rec. Doc. 9-1 at 597-600.

other symptoms had improved with physical therapy. He wanted to hold off on having another MRI and wanted to continue physical therapy.

On January 16, 2019, Mr. Harrison again saw nurse Schexnyder.[64] The problems reviewed were: uncontrolled Type II diabetes, diabetic peripheral neuropathy, Vitamin D deficiency, hyperlipidemia, primary insomnia, benign hypertension, prolapsed lumbar intervertebral disc, degeneration of the cervical and thoracic intervertebral discs, cervical radiculopathy, lumbar radiculopathy, spasms of back muscles, vertigo, history of subarachnoid hemorrhage, and long-term drug therapy. He was instructed to take Tylenol for pain. Lab work was done, and his AIC and cholesterol levels were expected to be elevated because he had not been taking his medication for the previous three to four months.

Mr. Harrison returned to nurse Schexnyder on January 23, 2019.[65] He reported pain in both legs, but primarily the right. He was weak and dizzy and having a hard time walking. He could not stand with his feet together without leaning on the wall, he could not walk a straight line without leaning over and bracing against the wall, he could not toe to heal walk without holding on to the wall for support. He was sent to the emergency room for evaluation. That same day,

---

[64]    Rec. Doc. 9-1 at 593-597.

[65]    Rec. Doc. 9-1 at 590-593.

January 23, 2019,[66] Mr. Harrison went to the emergency room at Lafayette General Medical Center, complaining of dizziness with ear ringing associated with back pain and right lower leg pain that had begun the previous day. He reported that he felt off balance. A CT scan of his brain found no acute intracranial abnormalities. He was prescribed meclizine for dizziness.

On March 20, 2019, Mr. Harrison testified at a hearing. He confirmed that he had returned to work as a special education teacher for the Lafayette Parish School System on February 11, 2019, after working as a substitute teacher for the school system beginning on February 4, 2019, ending his period of disability. He explained that on April 6, 2015, he stepped off a truck with a door balanced on his head and felt a sharp shock down through his arm. He reported the accident, stopped working, filed a workers' compensation claim, and settled that claim with his former employer. He described the subarachnoid hemorrhage that occurred in November 2015, which he associated with confusion and balance issues. He reported that he had cervical spine surgery on June 30, 2017. He testified that his left arm improved after surgery, but he claimed that he could not raise his right arm at that time. He went to a neurologist and was diagnosed with a labrum tear and a rotator cuff tear. His stated that his shoulder improved with physical therapy. He testified that, during

---

[66]    Rec. Doc. 9-1 at 565-569.

the alleged period of disability, he was prescribed Flexeril and Gabapentin, which increased his dizziness and confusion, and was prescribed Trazodone because he had trouble sleeping. He claimed that, during that time period, he needed to change positions every fifteen or twenty minutes due to pain, had trouble walking, and was veering, stumbling, and nearly falling. He stopped driving during that time. He stated that he passed the time with a lot of reading, watching television, and praying. He testified that he could not tolerate noise well and gave up going to church or other gatherings. He said that he did not go to the movies between 2015 and 2019. However, he went to the movies again shortly before the hearing and he also resumed driving as well as working.

Mr. Harrison now seeks reversal of the Commissioner's adverse ruling.

## Analysis

### A.    Standard of Review

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence.[67] "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as

---

[67]    *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

a reasonable mind might accept as adequate to support a conclusion."[68]  Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[69]

If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.[70]  In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner.[71]  Conflicts in the evidence[72] and credibility assessments[73] are for the Commissioner to resolve, not the courts.  Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination:  (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience.[74]

---

[68]     *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

[69]     *Hames v. Heckler*, 707 F.2d at 164 (citations omitted).

[70]     42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173.

[71]     *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1022.

[72]     *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).

[73]     *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991).

[74]     *Wren v. Sullivan*, 925 F.2d at 126.

B.    **Entitlement to Benefits**

The Disability Insurance Benefit ("DIB") program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence.[75]  The Supplemental Security Income ("SSI") program provides income to individuals who meet certain income and resource requirements, have applied for benefits, and are disabled.[76]  A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[77]  A claimant is disabled only if his physical or mental impairment or impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[78]

---

[75]    See 42 U.S.C. § 423(a).  See, also, *Smith v. Berryhill*, 139 S.Ct. 1865, 1772 (2019).

[76]    42 U.S.C. § 1382(a)(1) & (2).  See, also, *Smith v. Berryhill*, 139 S.Ct. at 1772.

[77]    42 U.S.C. § 1382c(a)(3)(A).

[78]    42 U.S.C. § 1382c(a)(3)(B).

## C.    Evaluation Process and Burden of Proof

The Commissioner uses a sequential five-step inquiry to determine whether a claimant is disabled, which considers whether the claimant (1) is currently engaged in substantial gainful activity; (2) has a severe impairment; (3) has an impairment enumerated in the relevant regulations; (4) is able to do the kind of work he did in the past; and (5) can perform any other work.[79]

Before going from step three to step four, the Commissioner evaluates the claimant's residual functional capacity[80] by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the record.[81]  The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work.[82]

The claimant bears the burden of proof on the first four steps; at the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy.[83]  This burden may be

---

[79]    20 C.F.R. § 404.1520; *Garcia v. Berryhill*, 880 F.3d 700, 704 (5th Cir. 2018).

[80]    20 C.F.R. § 404.1520(a)(4).

[81]    20 C.F.R. § 404.1545(a)(1).

[82]    20 C.F.R. § 404.1520(e).

[83]    *Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016); *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[84]  If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding.[85]  If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends.[86]

### D.    The ALJ's Findings and Conclusions

In this case, the ALJ determined, at step one, that the claimant did not engage in substantial gainful activity for more than twelve months between his alleged disability onset date and February 4, 2019 when he returned to work.[87]  Although the ALJ did not make a specific finding as to the specific time period when Mr. Harrison did not engage in substantial gainful activity, this Court assumes that time period to comprise April 5, 2015 (his alleged disability onset date) to February 4, 2019 (the date on which he returned to work).

At step two, the ALJ found that Mr. Harrison had the following severe impairments between his alleged disability onset date and February 4, 2019:

---

[84]    *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

[85]    *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Fraga v. Bowen*, 810 F.2d at 1302.

[86]    20 C.F.R. § 404.1520(a)(4); *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

[87]    Rec. Doc. 9-1 at 21.

24

degenerative disc disease with central spinal canal stenosis at C5-C6 and C6-C7 related to discopathy and spondylosis with broad-based posterior disc osteophyte complexes, multilevel foraminal stenosis, and cervical radiculopathy ("DDD"), and disorder of the nervous system (subarachnoid hemorrhage).[88]   This finding is supported by substantial evidence in the record and was not challenged.

At step three, the ALJ found that, from the alleged disability onset date until February 4, 2019, Mr. Harrison had no impairment or combination of impairments that meets or medically equaled the severity of a listed impairment.[89]  The claimant challenged this finding.

The ALJ found that, from the alleged disability onset date until February 4, 2019, the claimant had the residual functional capacity to perform the full range of light work.[90]  Mr. Harrison challenged this finding.

At step four, the ALJ relied upon the Social Security Administration's expedited process and made no findings concerning Mr. Harrison's past relevant work.[91]  The claimant did not challenge this part of the ruling.

---

[88]     Rec. Doc. 9-1 at 21.

[89]     Rec. Doc. 9-1 at 24.

[90]     Rec. Doc. 9-1 at 24-25.

[91]     Rec. Doc. 9-1 at 29.

At step five, the ALJ applied the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2 ("the Grids") and found that Mr. Harrison was not disabled between his alleged disability onset date and February 4, 2019.[92]   Mr. Harrison challenged this ultimate conclusion.

## E.   The Allegations of Error

Mr. Harrison contends that the ALJ erred (1) in giving great weight to the opinions of the state agency medical consultants resulting in a residual functional capacity finding that is not supported by substantial evidence; (2) in failing to find that his impairments meet the criteria of Listing 1.04; and (3) in failing to apply controlling law when assessing his residual functional capacity.

## G.   Did the ALJ Err in Weighing the Medical Opinions?

The Social Security regulations require the ALJ to evaluate every medical opinion in the record and decide how much weight should be assigned to each of them.[93]   Generally, more weight should be accorded to the medical opinions of a source who examined the claimant than to a source that did not do so,[94] and when

---

[92]     Rec. Doc. 9-1 at 29.

[93]     20 C.F.R. § 404.1527(c).

[94]     20 C.F.R. § 404.1527(c)(1).

Mr. Harrison's applications were filed, the opinions of treating physicians were entitled to controlling weight.[95]

Dr. Karl Boatman, the state agency physician who reviewed Mr. Harrison's records but did not examine him, opined on January 10, 2017, that Mr. Harrison had the residual functional capacity to perform light work and therefore was not disabled.[96] The ALJ gave "great weight" to Dr. Boatman's opinions and based his residual functional capacity finding and ultimate disability decision on Dr. Boatman's opinions. Mr. Harrison objected, arguing that Dr. Boatman rendered his opinions before Mr. Harrison had surgery on his cervical spine, before Mr. Harrison was diagnosed with a labrum tear in his right shoulder, and without noting various symptoms found in the treatment notes, suggesting that Dr. Boatman's opinions were not supported by substantial evidence in the record.

But Mr. Harrison did not point out any contrary medical opinions. The nurse practitioners at Duson Family Healthcare did not detail the ways in which Mr. Harrison's diabetic neuropathy, his spine condition, or his subarachnoid hemorrhage limited his ability to sit, stand, walk, bend, lift, reach, or perform any of the activities that were required of him at home or that he might encounter in the workplace.

---

[95]    See 20 C.F.R. § 404.1520c; 20 C.F.R. § 404.1527 ("For claims filed. . . before March 27, 2017, the rules in this section apply. For claims filed on or after March 27, 2017, the rules in § 404.1520c apply.").

[96]    Rec. Doc. 9-1 at 98-102.

Similarly, they did not place any restrictions on his activities because of his conditions. When Mr. Harrison was treated for the subarachnoid hemorrhage, he denied that it affected his gait, and the doctors who treated him for that condition did not place any restrictions on his activities following his hospitalization. The treatment notes from Dr. Guthikonda, the physician who performed Mr. Harrison's cervical spine surgery, noted that Mr. Harrison reported some numbness in his fingers and toes and some stiffness in his right shoulder with an accompanying decrease in range of motion, but Dr. Guthikonda described Mr. Harrison's gait as good. He did not offer any opinions regarding Mr. Harrison's ability to function before his surgery or place any restrictions or limitations on his ability to function after the surgery. On February 22, 2018, eight months after surgery, Dr. Guthikonda noted that it was "OK to do more and more activity as tolerated."[97] Thus, the record contains no medical opinions regarding Mr. Harrison's functionality that are contrary to Dr. Boatman's opinions.

On April 25, 2018, Mr. Harrison was observed to have an irregular, unsteady, staggering gait that was pulling to the left as well as an ear problem. It was suspected that his ear was causing his balance and gait issues. Just a month later, on May 30, 2018, Mr. Harrison was again observed to be unable to walk upright without leaning

---

[97]     Rec. Doc. 9-1 at 552.

on a wall for support.  He had an MRI soon thereafter, on June 8, which showed that

he might have an ear problem that could be affecting his balance.  When he followed

upon on June 13, he was referred to an ENT.  The record contains no subsequent

treatment notes from an ENT.  Furthermore, Mr. Harrison did not allege that any

type of ear or balance condition was disabling, and there is no evidence that the

issues he presented with on April 25 through June 13, 2018 lasted for more than

twelve months.

On January 23, 2019, Mr. Harrison again presented with similar symptoms.

He was weak, dizzy, and had a difficult time walking.  The nurse practitioner sent

him to the hospital emergency room.  A CT scan of his brain found no problems,

and he was prescribed medication for dizziness.  Again, this appears to have been a

short-term problem that was not determined to be associated with any of the

conditions that he alleged to be disabling.

Neither the nurse practitioners who treated Mr. Harrison when he was having

difficulty walking nor the emergency room physician who saw him for that problem

opined that Mr. Harrison was unable to work or placed any restrictions on his ability

to work or perform any activities.  Even though the times when Mr. Harrison was

observed as struggling to walk occurred after Dr. Boatman rendered his opinions,

there are no medical opinions in the record that contradict Dr. Boatman's opinions.

29

Indeed, there are no medical opinions in the record to which the ALJ could have given any weight other than Dr. Boatman's.

It is axiomatic that merely having symptoms or a diagnosis is not sufficient to establish that an impairment is severe,[98] to establish that an impairment meets or equals a listing,[99] or to establish that an impairment is disabling.[100]  In order for a person to be found to be disabled, his medical condition must result in functional impairments that prevent him from working.[101]  In this case, Mr. Harrison cannot point to any medical opinions establishing that his medical conditions impair his functionality to a degree that any such conclusion can be reached.  Therefore, this Court finds that the ALJ did not err in giving great weight to Dr. Boatman's opinions.

## H.    Did the ALJ Err in Failing to Find that the Claimant Meets Listing 1.04?

Listing 1.04 allows presumptive disability for certain spinal disorders.  The ALJ expressly found that "[t]here is no evidence of documented nerve compression, spinal arachnoiditis, or lumbar spinal stenosis to the degree as required by 1.04."

---

[98]    See, e.g., *White v. Saul*, No. 5-18-CV-00805-XR-RBF, 2019 WL 2642426, at *5 (W.D. Tex. June 26, 2019), report and recommendation adopted, 2019 WL 3816288 (W.D. Tex. July 18, 2019).

[99]    20 C.F.R. § 404.1525(d).

[100]    See *Johnson v. Sullivan*, 894 F.2d 683, 685 (5th Cir. 1990).  See, also, *Hames v. Heckler*, 707 F.2d at 165.

[101]    *Hames v. Heckler*, 707 F.2d at 165 (the claimant "must show that she was so functionally impaired by her [impairment] that she was precluded from engaging in any substantial gainful activity.").

Mr. Harrison argued, however, that MRI reports indicated that he suffered from nerve root compromise at C5-C6, C6-C7, T4-T5, , L3-L4, and L4-L5 sufficient to satisfy the listing.

To meet Listing 1.04(A), a claimant must show that he has a disorder of the spine "resulting in compromise of a nerve root (including the cauda equina) or the spinal cord" with:

> Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).[102]

The record contains reports from MRI examinations of Mr. Harrison's spine from May 5, 2015 (cervical spine), April 26, 2016 (lumbar and thoracic spine), and December 28, 2016 (cervical spine).  None of these reports expressly state that Mr. Harrison's spinal nerve roots were impinged, compressed, or otherwise compromised.  The MRI of May 5, 2015 showed "severe bilateral neural foraminal stenosis" at C5-C6 and "severe left and moderate-to-severe right neural foraminal stenosis" at C6-C7.  But there is no mention of nerve root compromise.  The MRIs of April 26, 2016 showed "fairly severe right foraminal stenosis" at T4-T5, "mild to moderate right foraminal stenosis" at L3-L4, and "moderate bilateral foraminal

---

[102]    20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.04(A).

stenosis" at L4-L5.    Again, however, there was no mention of nerve root compromise.    The MRI of December 28, 2016 showed "multilevel foraminal stenosis, greatest on the right at C6-C7."    Again, there is no mention of nerve root compromise.

Mr. Harrison's argument seemed to equate a finding of spinal stenosis with a finding of nerve root compromise.  But Mr. Harrison did not offer any evidence in an effort to establish that such findings are equivalent.  The record also fails to establish the motor loss, sensory loss, reflex loss, and positive straight leg raise tests necessary to satisfy the listing's criteria.  For example, when Mr. Harrison saw Dr. Guthikonda on February 9, 2017, he had a painful range of motion in his neck but a full range of motion in his lumbar spine; there was no indication that his deep tendon reflexes were abnormal in his arms or his legs; he had intact sensation to light touch in both upper extremities, Hoffman's sign was negative, he had full strength in his arms and legs, the straight leg raise test was negative in both legs, and his gait was good.[103]  Thus, even though the MRI reports had shown foraminal stenosis, the other criteria for Listing 1.04(A) were absent.

To establish that the claimant's condition or impairment meets a Listing, a "claimant must show that she has satisfied all the specified medical criteria of a

---

[103]     Rec. Doc. 9-1 at 519.

Listing at one time, and for the requisite continuous 12-month period."[104]  "An impairment that manifests only some [Listing] criteria, no matter how severely, does not qualify."[105]  The record contains sporadic but not consistent references to some of the listing criteria, but Mr. Harrison did not demonstrate that he has satisfied all of the criteria of Listing 1.04(A) for at least a twelve-month period.  Therefore, this Court finds that the ALJ did not err in finding that Mr. Harrison's neck and back conditions do not satisfy the criteria of Listing 1.04(A).

I. <u>**Did the ALJ Err in Evaluating the Claimant's Residual Functional Capacity?**</u>

A residual functional capacity assessment "is a determination of the most the claimant can still do despite his physical and mental limitations and is based on all relevant evidence in the claimant's record."[106]  The ALJ is responsible for determining a claimant's residual functional capacity.[107]  In making a finding in that regard, the ALJ must consider all of the evidence in the record, evaluate the medical opinions in light of other information contained in the record, and determine the

---

[104]    *Jaquez v. Saul*, No. EP-20-CV-001410RFC, 2020 WL 6293584, at *3 (W.D. Tex. Oct. 27, 2020). See, also, 20 C.F.R. § 404.1525 Listing of Impairments in appendix 1 ("We will find that your impairment(s) meets the requirements of a listing when it satisfies all of the criteria of that listing. . . .")

[105]    *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).  See, also, *Randall v. Astrue*, 570 F.3d 651, 659 (5th Cir. 2009).

[106]    *Perez v. Barnhart*, 415 F.3d at 462 (citing 20 C.F.R. § 404.1545(a)(1)).

[107]    *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995).

plaintiff's ability despite any physical and mental limitations.[108]  The evaluation of a claimant's subjective symptoms is a task particularly within the province of the ALJ who has had an opportunity to observe whether the person seems to be disabled.[109] In making a residual functional capacity assessment, an ALJ must consider all symptoms and the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence.  The ALJ must consider the limitations and restrictions imposed by all of an individual's impairments, even those that are not severe.[110]

Mr. Harrison argued that the ALJ failed to properly evaluate his residual functional capacity and impermissibly relied on Dr. Boatman's residual functional capacity finding, which was reached without consideration of all of the evidence in the record.  This Court's review of the ALJ's decision shows, however, that the ALJ did consider all of the evidence in the record – even that post-dating Dr. Boatman's evaluation – and found that it was consistent with Dr. Boatman's opinion. Furthermore, Mr. Harrison did not point out any functional deficits that he has that preclude him from performing the tasks required by work in the light category.  He

---

[108]    *Martinez v. Chater*, 64 F.3d at 176.

[109]    *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001); *Loya v. Heckler*, 707 F.2d 211, 215 (5th Cir. 1983).

[110]    *Giles v. Astrue*, 433 Fed. App'x 241, 245 (5th Cir. 2011) (citing 20 C.F.R. § 404.1545).

listed conditions that he has – "a stroke, two-level cervical fusion, moderate to severe nerve root compromise at three additional levels in his thoracic and lumbar spine[,] and a torn labrum and questionable HGAL in his right (dominant) shoulder"[111] – but he did not explain how any of those conditions functionally impaired his ability to work at a light level.  Again, it is not the existence of a condition or impairment but an inability to function at a particular level that determines a person's residual functional capacity.  Thus, this Court finds that the ALJ did not err in evaluating Mr. Harrison's residual functional capacity.

## Conclusion and Recommendation

For the foregoing reasons, IT IS THE RECOMMENDATION of this Court that the Commissioner's decision should be AFFIRMED, and this matter should be dismissed with prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

---

[111]    Rec. Doc. 11 at 9.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.[112]

Signed in Lafayette, Louisiana, this 23rd day of August 2021.

PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE

---

[112]    See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996) (en banc), superseded by statute on other grounds, 28 U.S.C. § 636(b)(1).

36